2022 IL App (1st) 201228-U
No. 1-20-1228

FIRST DIVISION
February 7, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ANTHONY G. ABBATE, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 CH-013869 |
| | ) | |
| THE RETIREMENT BOARD OF THE | ) | |
| POLICEMEN'S ANNUITY AND BENEFIT | ) | The Honorable |
| FUND OF THE CITY OF CHICAGO, | ) | Anna M. Loftus, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | | |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Walker concur in the judgment.

**ORDER**

¶ 1    *Held:* The decision of the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago that plaintiff Abbate, a former police officer, had forfeited his right to pension benefits affirmed where the record established that the plaintiff committed a felony related to, arising out of and in connection with his employment as a police officer in contravention of section 5-227 of the Illinois Pension Code. 40 ILCS 5/5-227 (West 2019)

¶ 2    The Board of Trustees of the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago (the Board) appeals from the circuit court's order reversing the Board's decision to deny the application of Anthony Abbate for a retirement annuity pension benefits in

accordance with section 5-227 of the Illinois Pension Code (Pension Code or Code) (40 ILCS 5/5-227 (West 2019). On appeal, the Board contends that its decision should be upheld based upon its finding that Abbate's felony conviction for aggravated battery was related to, or arose out of, or was in connection with his service as a Chicago police officer. For the reasons set forth herein, we reverse the judgment of the circuit court and affirm the decision of the Board.

¶ 3                                    BACKGROUND

¶ 4                              State Felony Conviction

¶ 5     Abbate joined the Chicago Police Department (Department) in 1994. At that time, he also became a participant in the Policemen's Annuity and Benefit Fund of the City of Chicago. In June of 2009, in a bench trial before the Honorable John J. Fleming, Chicago Police Officer Anthony Abbate was convicted of one count of aggravated battery for punching and kicking Karolina Obrycka ("Obrycka") about her body causing bruising and soreness while they were in a public place of amusement. He was subsequently sentenced to two years' adult intensive probation, along with drug and alcohol evaluation and treatment, curfew requirements, and anger management classes.[1] Defendant subsequently challenged his conviction on direct appeal, and this court upheld his conviction. *People v. Abbate*, No. 1-09-1801 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 6     During the criminal trial, Obrycka testified that on February 19, 2007, she was working as a bartender at Jesse's Shortstop Inn when she saw Abbate hit another customer, Jimmy Passera.

---

[1] Abbate was originally charged in a fifteen-count indictment, however, prior to trial, the prosecution *nolle prosecui* all of the counts of intimidation and communicating with a witness, and conspiracy; leaving him to be tried on two counts of official misconduct and one count of aggravated battery. At the close of the prosecution's case-in-chief, the trial court also granted Abbate's motion for a directed verdict as to two remaining counts of official misconduct.

After she told Abbate to stop hitting him, Abbate remained at the bar and Jimmy Passera moved to another side of the bar and away from Abbate. Shortly thereafter, Abbate walked behind the bar where customers are not permitted and approached Obycka. Twice, she told defendant to get out from behind the bar, but when he still did not move, she pushed him away. She also told him to not come back behind the bar because he did not belong there. Obrycka testified that he did not follow her instructions and repeatedly referred to his "big muscles." A few minutes later, she took Abbate's drink away from the bar and put it by the sink.

¶ 7 Abbate then picked up a bar stool and walked behind the bar for the second time. Obrycka tried to get the bar stool away from him, but Abbate repeatedly kicked her. He told her that "nobody tells me what to do." When another person came behind the bar and told him to stop kicking her, defendant let go of her, threw a garbage can to the floor and left the bar. During the time that she was at the bar, she did not hear Abbate identify himself as a police officer, he did not show her any type of police credentials, he was not in a police uniform, and she did not know that he was a police officer. After Abbate left, Obrycka called 911 and then called her managers. When some police officers arrived, she told them that there were cameras in the bar. During the criminal trial, the prosecution showed the videotape, which includes an audio recording, of the attack.

¶ 8 Martin Kolodziel, the manager of the bar, testified that he went to the bar after he received a phone call from Obrycka. After he arrived at the bar and spoke with Obrycka, he went to the back room where the video system was located and viewed the videotape of the battery. While some police officers were still at the bar, he offered to show them the video, but they declined his offer.

¶ 9 Telephone billing records for Abbate's landline were admitted into evidence showing telephone calls originating from his landline for the time period of February 19 through February 26, 2007. Linda Burnickas, Abbate's girlfriend, was a reluctant witness who asserted her 5th

Amendment rights, and her testimony was limited. She testified that after 9:30 p.m. on February 19, 2007, she received numerous telephone calls from "various people" and that she called "various people" regarding something that happened at the bar that night.

¶ 10    Chicago Police Officer Joseph Boroff, former partners with Abbate, testified that he received a phone call from Abbate at 11:19 p.m. on February 19, 2007. During that phone conversation, Abbate told him that he had gotten into a "little scuffle" with someone, and Abbate sounded like he had "a couple of drinks." Officer Boroff testified that he dismissed it and did not think that it was a serious matter. Two days later, when Abbate returned to work, Abbate used Officer Boroff's cellular telephone to make a few calls and left early from his shift. Officer Boroff drove Abbate back to the police district to see the captain to get permission to leave early. Sometime later that same evening, some officers from the Internal Affairs Division arrived at the police district and asked Officer Boroff if he knew where Abbate was located. Officer Boroff told them that Abbate left his shift early, but he did not know why he had done so. He complied with the IAD officers request for him to call Abbate and left a message with him.

¶ 11    Abbate testified in his own defense and asserted that he acted in self-defense. He first testified that he did not know that he was not allowed to go behind the bar as he had previously been allowed to do so to use the telephone, but then testified that he understood that Obrycka had the authority to tell him to leave that area and he disregarded her repeated requests. He testified that he went behind the bar only to get to the other side of the bar, that he never threatened to harm Obrycka with the bar stool, and, in fact, was trying to get away from her when she pulled him down and he struck his head. He felt that he was in physical danger from Obrycka and threw her to the ground only to get away from her. He further testified that he was inebriated that night, but his inebriated

state did not cause him to lose his balance and strike his head. He also admitted to previously placing Jimmy Passera in a chokehold and then hitting him three times on the side of his body.

¶ 12                                    Federal Civil Trial

¶ 13    Obrycka filed a federal civil lawsuit against Abbate and the City of Chicago, in which she contended that the defendants had violated her constitutional rights in relation to the beating she suffered at Jesse's Shortstop Inn. *Obrycka v. City of Chicago and Anthony Abbate*, 913 F.Supp.2d 598 (Dec. 20, 2012). On November 13, 2012, the jury returned a verdict in favor of Obrycka for the following claims:

> (1) Defendant City of Chicago had an official policy, also known as a widespread custom or practice, that was the moving force behind Defendant Abbate's conduct in the bar when he physically beat Obrycka in violation of her Fourteenth Amendment substantive due process right to bodily integrity; and
>
> (2) after the physical assault in the bar, Defendant Abbate and others entered into a conspiracy to violate Obrycka's constitutional right to freedom of speech as guaranteed by the First Amendment. *Id*. at 600-601.

¶ 14    The record contains the trial testimony of Obrycka and Abbate. Obrycka testified consistently with her testimony in the state criminal trial. She also testified that when the police officers arrived at the scene, she told them that the offender was a Chicago police officer named "Tony," his last name was "Abbate," and the beating was captured on a videotape. She wrote his name down on a piece of paper and handed it to one of the officers. She learned Abbate's name after having phone conversations with Margaret Kolodziel, the bar manager's wife, and Patti Chiriboga, another bartender at the bar. She further testified that she told the officers that the manager would be arriving shortly, and he could retrieve the videorecording for them. Despite Obrycka telling the

officers that the manager, Martin Kolodziel, had arrived, the officers walked out of the bar. Martin spoke with the officers and then retrieved the videotape from the bar, but the officers had already left when Martin Kolodziel returned outside to give it to them. The videotape corroborated her testimony as to what occurred inside the bar.

¶ 15    Shortly thereafter, the phone at the bar rang and Obrycka answered it. The female caller identified herself as a friend of "Tony" and that she was trying to get information from Obrycka, including Obrycka's last name. Around this same time, Gary Ortiz, a friend of Abbate, was seated at the bar, and asked her if she would not press charges if Abbate came over to the bar, apologized to her, and paid for some medical bills. Obrycka refused.

¶ 16    Three days after the beating, Obrycka was working at another bar when Martin Kolodziel and Patti Chiriboga, another bartender at Jesse's Shortstop Inn and a friend of Abbate, visited her. At that time, Patti Chiriboga told her that she had a meeting with Abbate and his friend, another Chicago police officer, in a parking lot. Patti Chiriboga said that Abbate told her that she needs to bring the videotape to him within two days or there would be drugs planted on the workers at the bar, and DUI's would be given to the customer at the bar.

¶ 17    Abbate testified at the civil trial that at approximately 4:30 p.m. on February 19, 2007, he walked into Jesse's Shortstop Bar and had a "verbal altercation" with Mike Muellner because Abbate was upset about what Muellner had said about Abbate's sick dog. Then, Abbate grabbed Muellner, threw him into the wall, picked him up, and threw him onto the floor. While Abbate explained his behavior by saying that "[his] brain wasn't working at all at that time[,]" Abbate also admitted that when he slammed Muellner into the wall, he was not concerned about being arrested because he was a Chicago police officer, and being arrested "[n]ever crossed [his] mind that day."

He admitted that he had a physical altercation with Jimmy Passera and Passera knew that he was a police officer.

¶ 18    At trial, Abbate described his actions as "self-defense" and claimed that Obrycka was the initial attacker. He testified that he was "highly intoxicated" that night and only remembers "small little fractions" of the evening and the next morning. He recalled that he received a telephone call from his friend, Gary Ortiz, that evening, telling him that the police were at the bar and that Abbate had gotten into a fight with Obrycka. However, he did not recall calling Gary Ortiz seven times before 12:50 a.m., and he denied that he told Ortiz to offer to pay Obrycka's medical bills. He described his actions as "self-defense" and claimed that Obrycka was the initial attacker. After the beating, he drove himself home and admitted that he made some telephone calls that night. However, he did not remember calling his girlfriend, Linda Burnickas, twenty-two times before 1:04 a.m., or asking her for help.

¶ 19    He did not recall having an eight-minute telephone conversation with Patti Chiriboga at 7:22 p.m. on February 20, 2007. Despite not being able to recall what they spoke about, he denied that he told her that he wanted the videotape or that he wanted her to tell Martin that he was a police officer, and a lot of bad things could happen to them. He further denied that he told her to tell Martin that he could use his position as a police officer to affect the bar, like writing DUI's and planting drugs on people. He further denied that he told her, "…I'm backed against the wall. I don't give a f***. I did - - I did that to [Obrycka], but I want the tape. I want the f***ing tape. He denied that he told her, "I'm pushed against - - this is my livelihood. I'm a police officer, I want - - I could - - I will lose my badge. I'll lose my pension." He denied that he told her, "Listen, b****, you f***ing get rid of that tape and you tell Martin to get rid of that tape or there's going to be people getting DUI's."

¶ 20      Abbate also did not recall calling his partner, Chicago Police Officer Joseph Boroff, thirteen times between 11:18 p.m. and 2:33 p.m. or having nine phone conversations with him during that time period that lasted at least thirty seconds. Abbate did not recall calling Joe Motyka, who had a brother who was a lieutenant in the 25th Police District, where the bar was located, on three different occasions before 10:42 a.m. on February 20, 2007.

¶ 21      Administrative Hearing

¶ 22      On August 30, 2018, Abbate filed an annuity benefit application with the Board. The Board subsequently held a hearing in which Abbate testified that he became a Chicago police officer on December 5, 1994, and he took a leave of absence in March of 2017. The Board was provided select transcripts of the criminal and civil trials, the Rule 23 Order of this court from Abbate's direct appeal of his criminal conviction (*People v. Anthony Abbate*, No. 1-09-1801 (December 22, 2010)), the published opinion from Abbate's civil trial (*Obrycka v. City of Chicago and Anthony Abbate*, 913 F.Supp.2d 598 (2012)), as well as a video and audio recording of Abbate's attack of Obrycka. Portions of the video and audio recording was played at the hearing, including a portion showing that, approximately an hour before the beating, Abbate was seated at the bar, shouted "Chicago Police Department" and flexed his arm muscles.

¶ 23      On October 31, 2019, the Board issued an order in which it determined that, pursuant to 40 ILCS 5/5-227 (West 2019), Abbate was not entitled to annuity benefits as his felony aggravated battery conviction was related to or arose out of or was in connection with his service as a policeman. Instead, the Board found that Abbate was entitled to only a refund of his contributions. Specifically, the Board "found Abbate to be evasive is [sic] responses made and not a credible witness." The Board further found:

"Based upon the above, the Board concludes and finds that but for and as direct result of Abbate's thirteen year CPD police officer status Abbate was of a state of mind that he could do whatever he wished in the bar. Abbate physically assaulted customers earlier in the day without anyone calling the police, whose response he did not fear. This further led to Abbate's conduct later in the day when he felt shielded from reprimand or reprisal such that he felt he could commit the felonious act of aggravated battery on the bartender and have his friend watch the assault happen, taking no action to intervene to stop or report the same."

¶ 24    In support of its decision, the Board relied upon the following evidence:

- On February 19, 2007, at 4:30 p.m., Abbate was involved in a verbal and physical altercation at the bar with Mike Muellner and Abbate admitted that he was not concerned about being arrested for his conduct because he was a Chicago police officer.

- Later that day, at 8:00 p.m., he had a physical altercation with his friend, Jimmy Passera, in the bar and when Abbate was asked if he was concerned about anyone calling the police, he testified that he was not concerned "about anything."

- Around this time, Abbate was scene on video recording flexing his muscles and publicly announcing "Chicago Police Department."

- At 9:00 p.m., Obrycka twice asked Abbate to move from behind the bar, but Abbate "didn't seem like he understood" and "kept talking about his muscles, what big muscles he got."

- A few minutes later, Abbate went behind the bar again, threw Obrycka to the floor, punched and kicked her, while yelling "Nobody tells me what to do."

- Jimmy Passera, knowing that Abbate was a Chicago police officer, did not interfere and did not render assistance to Obrycka.

- On November 13, 2012, a federal civil jury returned a verdict in favor of Obrycka and against the City of Chicago in that it had a persistent and widespread custom or practice that was the moving force behind Abbate's conduct in the bar when he physically beat Obrycka, as well as against Abbate for Obrycka's claim that Abbate conspired with others under color of law in violation of her First Amendment rights to free speech.

¶ 25　　Abbate sought review in the Circuit Court of Cook County pursuant to the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2004)). The circuit court reversed the Board's decision to deny pension annuity benefits and granted Abbate his annuity benefits retroactive to the date of his application. The circuit court determined that the Board's decision was clearly erroneous where "(1) there was no evidence identified in the record to support the conclusion that Plaintiff had an 'above-the-law' state of mind at the time he committed the battery, and (2) there was no evidence identified in the record that the state of mind motivated the battery." This appeal followed.

¶ 26　　　　　　　　　　　　　　　　　ANALYSIS

¶ 27　　Pointing to evidence of Abbate's conduct before, during and after he committed the felony offense of aggravated battery, the Board maintains that its decision should be upheld where it properly found that Abbate's felony conviction for aggravated battery related to, arose out of, or was in connection with his service as a Chicago police officer. Regarding Abbate's conduct prior to and during the commission of the aggravated battery, the Board points to Abbate's conduct in which he slammed Mike Muellner into the wall and subsequently struck Jimmy Passera, and Abbate's admission that he was not concerned about being charged with a crime that night. The Board also points to Abbate's conduct, approximately one hour before the beating, in which he flexed his muscles and publicly announced "Chicago Police Department," and when he yelled at

Obrycka "Nobody tells me what to do" as he beat and kicked her. The Board argues that Abbate acted with impunity committing crimes against two others, and later Obrycka, "under the mistaken belief that his status as a Chicago Police Officer would shield him from liability."

¶ 28       Relying upon Abbate's conduct after he committed the felony offense of aggravated battery, the Board argues that Abbate used his position as a police officer to interfere with a criminal investigation into his own conduct at the bar. In doing so, the Board relies upon the language used by the federal court to describe the evidence presented at the federal civil trial. Specifically, the federal district court found:

> "At trial, the jury heard evidence concerning both a code of silence within the CPD and a widespread custom or practice of failing to adequately investigate and/or discipline officers. Specifically, [Obrycka's] counsel presented evidence that Obrycka and Jesse Shortstop Inn's owner, Martin Kolodziej, told the officers responding to the February 19, 2007 incident – Officers Peter Masheimer and Jerry Knickrehm – that Abbate was a police officer and that the beating was captured on videotape, yet Officers Masheimer and Knickrehm did not put these details in their police report of the incident…Trial evidence further revealed that within hours of the beating, Defendant Abbate made countless telephone calls, including calls to his partner at the 20th District, Joseph Boroff. Boroff, in turn, called numerous other Chicago police officers, including Officer Masheimer's partner in the 25th District. Further, the jury heard evidence regarding the investigations into Officers Masheimer's and Knickrehm's conduct surrounding the reporting of the February 19, 2007 incident. Obrycka also presented evidence regarding the CPD's effort to locate and arrest Defendant Abbate after the beating and that Abbate was originally charged with

a misdemeanor battery and not a felony." *Obrycka v. City of Chicago and Anthony Abbate*, 913 F.Supp.2d 598, 603-604 (Dec. 20, 2012).

¶ 29       The Board also argues that the verdict at the civil trial supports its conclusion that his conduct was related to his service as a police officer. Specifically, the jury verdict in the civil trial found:

"Defendant City of Chicago had a persistent widespread custom or practice that was moving force behind Defendant Abbate's conduct in the bar when he physically beat Plaintiff on 2/19/97. The jury returns a verdict in favor of Plaintiff Karolina Obrycka and against Defendant Anthony Abbate on Plaintiff's claim that Defendant Abbate conspired with others under the color of law in violation of Plaintiff's First Amendment rights to Freedom of Speech…"

¶ 30       In response, Abbate contends that the Board's failed to support its factual finding that Abbate was "evasive" and "not a credible witness[.]" As to the Board's factual finding that there was a sufficient nexus between Abbate's felony conviction and his service as a police officer, Abbate contends that this decision is not supported by the three Illinois cases that have interpreted this particular language of section 5-227. See *Cullen v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 271 Ill.App.3d 1105 (1st Dist. 1995); *Siwik v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 324 Ill.App.3d 820 (1st Dist. 2001); *Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 199 Ill.2d 414 (2002). Asking this court to focus on the "but for" test applied in these three cases, Abbate contends that his conduct did not provide the requisite nexus where the Board misstated the evidence and merely relied upon bits and pieces of Abbate's testimony. Instead, Abbate contends that, when his testimony is considered in its entirety, there was no evidence to establish his state of mind at the time that he committed this offense so there was no nexus between Abbate's conduct and his service as a Chicago police officer.

¶ 31      He further contends that the Board waived its argument on appeal that there was a sufficient nexus between his felony aggravated battery conviction and his service as a Chicago police officer based upon his conduct after he committed the offense, where the Board did not rely upon it to support its conclusion. Waiver aside, he contends that evidence of his conduct, after he committed the felony offense of aggravated battery, is irrelevant to a determination as to whether there is a sufficient nexus.

¶ 32                                    Standard of Review

¶ 33      As a threshold matter, we must consider the appropriate standard of review. Appeals from administrative hearings are governed by administrative review law. 735 ILCS 5/3-101 (West 2002); *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill.2d 368, 385 (2010). In an appeal from the decision of the trial court on a complaint for administrative review, we review the decision issued by the Board rather than that of the trial court. *Siwik v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 324 Ill.App.3d 820, 824 (1st Dist. 2001). "[T]he board of trustees of a police pension fund is the entity statutorily empowered to verify an applicant's disability and right to receive benefits. [Citation]" *Wade v. City of North Chicago Police Pension Board*, 226 Ill.2d 485, 513 (2007).

¶ 34      In administrative review law, we may not consider new or additional evidence beyond what was originally presented to the Board, and the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 1994). It is within the Board's province to accord weight to the evidence, resolve conflicts presented by the evidence, and determine the credibility of witnesses. *Prawdzik v. Board of Trustees of Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 36. Accordingly, we defer to the Board on questions of fact unless its findings are against the

manifest weight of the evidence, meaning that the opposite conclusion is clearly evident. *Wade*, 226 Ill.2d at 504, citing *Marconi v. Chicago Heights Police Pension Bd.*, 225 Ill.2d 497, 532 (2006); *Jones v. Board of Trustees of the Police Pension Board*, 384 Ill.App.3d 1064, 1067 (4th Dist. 2008). At the same time, our deference to the Board is not without limit. *Ashmore v. Board of Trustees of Bloomington Police Pension Fund*, 2018 IL App (4th) 180196, ¶ 41. There must be competent evidence in the record to support the Board's decision. *Miller v. Board of Trustees of Oak Lawn Police Pension Fund*, 2019 IL App (1st) 172967, ¶ 40. If the record contains evidence that supports the Board's factual conclusions, then we shall not disrupt those conclusions, even if an opposite conclusion is reasonable. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill.2d 533, 538 (1997). "The fact that an opposite conclusion is reasonable or that a reviewing court might have ruled differently will not justify reversal of the administrative findings." *Abrahamson v. Illinois Dept. of Professional Regulation*, 153 Ill.2d 76, 88 (1992).

¶ 35     The Board applies a two-part test when deciding the issue of whether a police officer's pension benefits should be forfeited under the first paragraph of section 5-227. The Board first determines the factual circumstances giving rise to the police officer's felony conviction, which may be in conflict. The Board then interprets and applies the statutory language "any felony relating to or arising out of or in connection with his service as a policeman" to the facts of the case. See 40 ILCS 5/5-227 (West 2019).

¶ 36     Here, both parties agree that the issue presented is one of mixed law and fact and seek for this court to review the Board's decision for clear error. We review an agency's conclusion on a mixed question of law and fact for clear error. *Elementary School District 159 v. Schiller*, 221 Ill.2d 130, 143 (2006). Clear error affords significant deference to an agency's experience in construing and applying the statutes that it administers. *Id*. An agency's decision is clearly erroneous only when

a reviewing court, based upon the entire record, is left with the definite and firm conviction that a mistake has been made. *Comprehensive Community Solutions v. Rockford School Dist. No. 205*, 216 Ill.2d 455, 472 (2005)

¶ 37                                    Factual Findings

¶ 38     At the outset, we find that the Board's factual findings were not against the manifest weight of the evidence. This court is unpersuaded by Abbate's contention that the Board's decision should be reversed where it failed to support its conclusion - that Abbate was evasive and not credible - with any supporting evidence. In an action under the Administrative Review Law, the Board is the fact finder responsible for overseeing testimony, making credibility determinations, and assigning weight to statements made by witnesses. *Kimball Dawson LLC v. City of Chicago Dept. of Zoning*, 369 Ill.App.3d 780, 787 (1st Dist. 2006). "Unless a statute requires specific factual findings, an administrative agency is only required to provide a record and findings to permit orderly and efficient judicial review." *Kimball Dawson LLC*, 369 Ill.App.3d at 787, citing *Board of Education of Park Forest Heights School District No. 163 v. State Teacher Certification Board*, 363 Ill.App.3d 433, 442 (1st Dist. 2006). Where, as here, the testimony and evidence are preserved in the record, this court has sufficient grounds to examine the Board's decision and specific factual findings are not required. *Id*. at 787.

¶ 39     Abbate also argues that the Board misstated the facts relating to his testimony by "picking and choosing parts of the record" to support its conclusion. Again, it is within the purview of the agency hearing the testimony to make decisions regarding the factual determinations, and these decisions are held to be *prima facie* true and correct unless contrary to the weight of the evidence. 735 ILCS 5/3-110 (West 1994). When faced with a conflict of evidence, "it was the Board's function, as the finder of fact, to assess the credibility of the documentary information and the testimony of the

witnesses and to determine the appropriate weight to be given the evidence." *Marconi v. Chicago Heights Police Pension Bd.*, 225 Ill.2d 497, 540 (2006). "So long as the record contains evidence supporting the agency's decision, that decision should be affirmed." *Marconi*, 225 Ill.2d at 540, citing *Commonwealth Edison Company v. Property Tax Appeal Board*, 102 Ill.2d 443, 467 (1984). The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. *Id.* at 534; *Abrahamson v. Ill. Dept. of Professional Regulation*, 153 Ill.2d 76, 88 (1992); *Robbins v. Board of Trustees of the Carbondale Pension Fund*, 177 Ill.2d 533, 538 (1997).

¶ 40    Contrary to Abbate's argument otherwise, there was evidence to support the Board's conclusion that Abbate was not concerned about being arrested that night because he was a Chicago police officer. While Abbate explained his behavior, testifying at the administrative hearing, by saying that "[his] brain wasn't working at all at that time[,]" he also admitted that when he slammed Muellner into the wall, he was not concerned about being arrested because he was a Chicago police officer, and being arrested "[n]ever crossed [his] mind that day." Moreover, while Abbate testified that he did not recall the events from that evening because he was "highly intoxicated[,]" he was able to conveniently recall parts of the evening in order to explain his actions.

¶ 41    Moreover, Abbate takes issue with the Board's conclusion that the video recording showed him flexing his muscles and publicly announcing "Chicago Police Department." Abbate relies upon his testimony that he did not mean anything by this conduct and was "just messing around." He further points out that the made this public announcement more than one hour before he physically attacked Obrycka. However, the Board, as the fact finder, was entitled to reject Abbate's

assertion that he was merely "messing around" by this conduct. Therefore, we are unpersuaded by Abbate's request for this court to find that the Board's factual findings were manifestly erroneous.

¶ 42                     Applicable Tests and Available Evidence

¶ 43      Next, as to this court's task in applying these factual findings to the appropriate statutory language, this court recognizes that Section 5-227 of the Illinois Pension Code is a pension forfeiture statute and provides as follows:

> "None of the benefits provided for in this Article shall be paid to any person who is convicted of any felony relating to or arising out of or in connection with his service as a policeman." 40 ILCS 5/5-227 (West 2019).

¶ 44      As to Abbate's suggestion that this court should only look to the statutory interpretation announced in those cases interpreting section 5-227, the pension forfeiture provision applicable to Chicago police officers, this court rejects such a narrow view. Instead, we will also look to cases in which the courts have interpreted this same type of forfeiture provision in other pension codes. As the Illinois Supreme Court has previously recognized, this same type of forfeiture provision of the Code can also be found in the pension codes governing members of the General Assembly (40 ILCS 5/2-156 (West 1998)), participants in the Illinois Municipal Retirement Fund (40 ILCS 5/7-219 (West 1998)), participants in the Municipal Employees', Officers', and Officials' Annuity and Benefit Fund (40 ILCS 5/8-251 (West 1998)), sanitary district employees (40 ILCS 5/13-807 (West 1998)), state employees (40 ILCS 5/14-149 (West 1998)); judges (40 ILCS 5/18-163 (West 1998)), and others (see, e.g. 40 ILCS 5/16-199 (West 1998). *Devoney v. Retirement Bd. of Policemen's Annuity & Ben. Fund for City of Chicago*, 199 Ill.2d 414, 418 (2002). The Illinois Supreme Court recognized that this choice of words in the pension forfeiture statutes "are general in describing how the felony conviction must pertain to an employee's public service before the

pension benefit disqualification will be triggered, but they could not be otherwise. The ways in which governmental offices can be exploited for illicit purposes are so diverse and varied that greater specificity would be impossible." *Devoney*, 199 Ill.2d at 418.

¶ 45    The applicability of section 5-227 warranting forfeiture of Abbate's pension benefits depends on whether his conviction for felony aggravated battery was related to, arose out of, or was connected with his service as a Chicago police officer. In determining whether section 5-227 of the Code applies to disqualify Abbate pension benefits, "the pivotal inquiry is whether a nexus exists between [his] criminal wrongdoing and the performance of his official duties." *Devoney*, 199 Ill.2d at 419. Over the years, the Illinois courts have developed and applied three alternative tests for analyzing this provision of the Code: the "but for" test (*Devoney v. Retirement Bd. of Policemen's Annuity & Ben. Fund for City of Chicago*, 199 Ill.2d 414, 418 (2002)), the "substantial factor" test (*Bloom v. Municipal Employees' Annuity and Benefit Fund of Chicago*, 339 Ill.App.3d 807 (1st Dist. 2003)), and whether the conviction is "in *some* way" connected to the plaintiff's employment (*Goff v. Teachers' Retirement System of State of Illinois*, 305 Ill.App.3d 190, 195 (5th Dist. 1999)).

¶ 46    In *Devoney*, the Supreme Court first developed and applied a "but for" test for determining whether there is a nexus between a felony and an officer's performance of his official duties. *Id*. In *Devoney*, a police officer pled guilty to mail fraud after he and two friends attempted to defraud an insurance company by filing a false personal injury claim. A pension board determined that the officer forfeited his pension rights by committing the felony, and the supreme court affirmed, concluding:

> "At [his friend's] behest, Devoney had used his position on the police force for [his friend's] benefit over a protracted period of time. Based upon these circumstances, there

was ample ground for the Retirement Board's finding that '*but for* the fact that Devoney was a Police Officer of high rank,' he 'would not have been in the position or selected to participate in the scheme to defraud [which led to his conviction].'

Because Devoney's participation in the scheme to defraud was the product of his status as a law enforcement official, we believe that the nexus required by [the pension forfeiture statute] was present. Devoney's conviction in federal court, was 'relat[ed] to or [arose] out of or in connection with his service as a policeman' so as to render him ineligible for his police pension benefits." (Emphasis in original) *Id*. at 423-424.

¶ 47    In addition to the "but for" test employed in *Devoney*, other courts have framed the inquiry as to whether one's employment was a "substantial factor" in the felony, in the style of causation. *Bloom v. Municipal Employees' Annuity and Benefit Fund of Chicago*, 339 Ill.App.3d 807 (1st Dist. 2003). In *Bloom*, this court discussed the various tests used by courts to determine if the required nexus has been established and found that *Devoney* did not mandate the application of the "but for" test to every nexus analysis. *Bloom*, 339 Ill.App.3d at 815. Instead, the court in *Bloom* utilized a "substantial factor" test as an alternative to the "but for" test. *Id*. Under the 'substantial factor' test, the defendant's conduct is said to be a cause if it was a "material element and a substantial factor" in bringing the event about. *Id*., quoting *Thacker v. UNR Industries, Inc.*, 151 Ill.2d 343, 354-355 (1992).

¶ 48    This court has also employed a third test, looking at whether the conviction is "in *some* way" connected to the plaintiff's employment. *Goff v. Teachers' Retirement System of State of Illinois*, 305 Ill.App.3d 190, 195 (5th Dist. 1999). In *Goff*, the plaintiff, a retired school principal, pled guilty to the aggravated criminal sexual abuse of children attending his school. While the conduct

underlying his conviction did not take place on school property or at school events, his pension was revoked pursuant to the applicable pension forfeiture provision.

¶ 49    On appeal, the plaintiff argued that his pension could only be revoked if the felony had occurred on school time or on school property. The court found that the plaintiff's interpretation of the pension forfeiture language was too narrow, and "[t]he statutory phrases 'relating to', 'arising out of', and 'in connection with' are very broad terms." *Goff*, 305 Ill.App.3d at 195. In finding that these terms should be interpreted in a broad manner, the *Goff* court found that, if the conviction "is in *some* way connected with the employment so that there is a causal connection" between the employment and the conviction, then the conviction can be said to arise out of employment, sufficient with the forfeiture provision. *Id*. at 195. The court found that there was a sufficient connection between his employment and his conviction where the plaintiff used his service as a teacher to exert influence over the victims as well as their parents in order for them to trust him to take the victims to various places and spend the night at the plaintiff's home. *Id*. The court also found that there was a sufficient connection where the plaintiff used his service as a teacher to apply for and receive the position of scoutmaster and church camp counselor, which, in turn, enabled the plaintiff to commit the crimes to which he eventually pled guilty. *Id.*

¶ 50    Thus, while the Board utilized a "but for" test in analyzing the evidence in this case, this particular test is merely one acceptable method of establishing the nexus between crime and public employment required for forfeiture under the pension statutes and that other means of establishing this link are equally permissible. *Bloom*, 339 Ill.App.3d at 816. Therefore, we are not limited in viewing the evidence exclusively under the "but for" test and recognize that "the pivotal inquiry is whether a nexus exists between the employee's criminal wrongdoing and the performance of his official duties." *Devoney*, 199 Ill.2d at 419, citing *DiFiore*, 313 Ill.App.3d at 551.

¶ 51    Abbate also seeks to preclude the Board from relying upon Abbate's conduct after he committed the felony offense of aggravated battery. First, Abbate argues that the Board waived this argument where the Board did not rely upon this theory in its determination. While the Board did not conclude that Abbate's conduct after he committed the felony offense of aggravated battery provided the necessary evidence to show the nexus between his conviction and his service as a police officer, we are not precluded from doing so. Although the Board, in denying Abbate's application, utilized a different theory, judicial review of an administrative decision extends "to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2019). We may affirm an administrative agency's decision on any basis in the record, regardless of its reasoning. See *Ball v. Board of Education of the City of Chicago*, 2013 IL App (1st) 120136, ¶ 27; *Slocum v. Board of Trustees of State Universities Retirement System*, 2013 IL App (4th) 130182, ¶ 41.

¶ 52    Upon finding that the Board did not waive this argument, we also find that the Board can rely upon Abbate's conduct after he committed the felony offense of aggravated battery in arguing that there was a nexus between the felony and his service as a Chicago police officer. For guidance, we look to *Siwek v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 324 Ill.App.3d 820, 822-23 (2001) and *Bloom v. Municipal Employees' Annuity and Benefit Fund of Chicago*, 339 Ill.App.3d 807 (1st Dist. 2003).

¶ 53    *Siwek*, the plaintiff, a police officer, was convicted of two felony charges of narcotics; consequently, his pension benefits were revoked. The evidence established that Siwek gave $12,000 to Marchese to purchase narcotics. Marchese purchased from Weiss, an undercover agent, and was arrested. After the arrest, Marchese became an informant for the police to expose Siwek as the source of the funds, and Marchese arranged for Siwek to make another drug purchase. Siwek

was arrested when he arrived at Marchese's home and bought cocaine from Weiss who was still working as an undercover agent.

¶ 54 During the criminal trial, Siwek testified that he gained knowledge of the narcotics trade as part of the gang crime unit, which included "undercover buys[,]" in the organized crime division, which included working on large-scale drug operations, and in the violent crimes unit investigating narcotics-related homicides. On appeal, this court found that the plaintiff used "specialized knowledge" gained in his service as a police officer to commit the felony. *Siwek*, 324 Ill.App.3d at 829. Based on this evidence, this court held that the plaintiff's pension forfeiture was justified under section 5-277 of the Code. *Id.*

> "We agree with the Board that Siwek's conviction was connected to, or, at the very least, was related to his service as an officer. Siwek was a police officer who spent most of his career specializing in narcotics investigations. Logic compels us to conclude that Siwek called upon the specialized knowledge he gained in his service as a police officer when he committed the felony for which he was convicted." *Id.*

¶ 55 In finding that there was a sufficient nexus, this court recognized that the plaintiff's two felony convictions "did not occur in a vacuum." *Id.* Notably, this court found:

> "We do not analyze the conviction solely on the basis of what happened on the day of the arrest. That would be parsing the first paragraph of section 5-227 with too sharp a scalpel. We believe the legislature's charge to us is to examine the conviction in a way that deters police officers from violating the public trust while refraining from distorting the clear words of the statute." *Id.*

¶ 56 Likewise, we reject Abbate's suggestion that we view the evidence in a vacuum. While Siwek involved the court looking at the plaintiff's conduct leading up to the commission of the offense,

this court finds that this same type of broader focus should include looking at the plaintiff's conduct after the commission of the offense, which is related to that offense. In doing so, we are following the legislature's charge to examine Abbate's conviction in a way that deters police officers from violating the public trust and, at the same time, does not distort the clear words of section 5-227. Like in *Siwek*, we find that this conclusion serves to deter police officers from violating the public trust by utilizing their position as a Chicago police officer to try to cover up their misconduct or by attempting to influence the investigation conducted in the commission of a committing a felony offense. Adoption of the construction suggested by Abbate would send a message to Chicago police officers that their retirement benefits will not be jeopardized if, after committing a felony offense, they take steps to attempt to cover up their misconduct or attempt to influence the investigation into their misconduct. Such a message was certainly not the intent of the legislature in enacting the pension forfeiture provision of section 5-227.

¶ 57    Pension forfeiture statutes were enacted to "deter felonious conduct in public employment by affecting the pension rights of public employees convicted of a work-related felony." *Devoney*, 199 Ill.2d at 418. Their purpose is to discourage official malfeasance by causing a forfeiture of benefits to which a public servant otherwise would be entitled. *Id.*, citing *Kerner v. State Employees' Retirement System*, 72 Ill.2d 507, 513 (1978). Moreover, their purpose is to "…ensure that the retirement of a corrupt public servant is never financed by the very constituency whose trust was betrayed." *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill.2d 315, 323 (2010).

¶ 58    Building upon this court's utilization of a broader focus in looking at the plaintiff's conduct, we recognize that, in *Bloom*, the court found that it is proper for the pension board to consider "other crimes evidence" related to the disqualifying felony as proof of that felony's relationship to

the employee's public position. *Id.* at 813. In *Bloom*, the plaintiff, a former Chicago alderman, pled guilty in federal district court to filing a false tax return. While Bloom was charged with multiple crimes related to his involvement in the "Silver Shovel" investigation into corruption in city government and accused Bloom of activities that would have constituted misuse of his public office, Bloom pled guilty to one count of filing a false tax return relating to his private real estate business. At the sentencing hearing, the federal district court judge rejected the prosecution's request to enhance Bloom's sentence because his conviction "involved the abuse of a position of public trust." The court found that Bloom's conviction for a violation of a tax law did not involve abuse of position of public trust.

¶ 59        However, in finding Bloom's felony conviction "arose out of or was in connection with" his position as an alderman, the Board relied upon evidence, contained in the plea agreement and other documentation, showing that Bloom admitted that some of the funds falsely categorized in the tax return were amounts paid to him in exchange for the improper use of his office. This included evidence that Bloom "in exchange for money, defendant agreed to use and did use his name, official position, and influence as an Alderman of the Fifth Ward to assist Christopher in obtaining and operating sites for rock-crushing…" *Id.* at 812.

¶ 60        On appeal, Bloom argued that the Board erred when it relied upon evidence beyond the elements of the crime he was convicted of and upon the district court judge's rejection of the suggestion that the offense constituted an abuse of a position of public trust. The *Bloom* court examined the determination in *Devoney* that the pension board could not consider a prior incident of obstruction of justice introduced during the sentencing hearing, finding that this obstruction charge was irrelevant to the plaintiff's pension eligibility claim. *Id.* at 812-13. The court rejected

the plaintiff's argument that the court in *Devoney* concluded that evidence of crimes other than the disqualifying felony cannot be considered by pension boards. Instead, the court in *Bloom* held:

> "The *Devoney* court, however, did not purport to follow or announce a rule limiting the nature of evidence that may be considered by municipal pension trustee boards…Though *Devoney* confirms that evidence of a crime that does not result in conviction cannot, by itself, disqualify a municipal employee from pension benefits under the forfeiture statutes, nothing in the court's analysis can be construed as a *per se* prohibition of other crime evidence in pension forfeiture proceedings, or as an edict that such evidence, if related to the allegedly disqualifying felony, may not be considered as proof that felony's relationship to the employee's public position…" *Bloom*, 339 Ill.App.3d at 847-848.

¶ 61    Likewise, here, evidence of Abbate's conduct after he committed the felony offense of aggravated battery falls within the type of "other crimes evidence" that was related to the disqualifying felony conviction of aggravated battery and should be considered as proof of that felony's relationship to Abbate's service as a Chicago Police officer. The "other crimes evidence" in this case amounted to federal district court's summarization of the evidence presented at the federal civil trial in which the district court concluded: (1) that the responding officers were told that Abbate was a police officer and the beating was captured on videotape, but the officers did not put these details in their police report of the incident; and (2) within hours of the beating, Abbate made countless telephone calls, including calls to his partner at the 20th District, Joseph Boroff, who, in turn, made numerous telephone calls to other Chicago police officers, including Officer Masheimer's partner. *Obrycka v. City of Chicago and Anthony Abbate*, 913 F.Supp.2d 598, 603-604 (December 20, 2012). The "other crimes evidence" in this case was also presented by

other testimony contained in the trial transcripts from his state criminal trial and his federal civil trial.

¶ 62    Notably, contrary to Abbate's argument that this type of evidence was irrelevant, this type of conduct amounted to admissible other crimes evidence where it was "part of a continuing narrative of the events giving rise to the offense or, in other words, intertwined with the offense charged." See *People v. Abernathy*, 402 Ill.App.3d 736, 749 (4th Dist. 2010), quoting *People v. Thompson*, 359 Ill.App.3d 947, 951 (2005). It was also admissible as other crimes evidence related to his consciousness of guilt. *Abernathy*, 402 Ill.App.3d at 750. For instance, in *Abernathy*, this court found that other crimes evidence showing that the defendant set fire to the home in which the domestic battery occurred in an attempt to destroy evidence of his earlier crime, was admissible under the "continuing-narrative exception" to the general rule that other crimes evidence is inadmissible. This court further found that "'[e]vidence that the accused has attempted to destroy evidence against himself is always admissible for the purpose of showing consciousness of guilt.'" [citation omitted] *Id.* at 750.

¶ 63    Therefore, looking at the totality of the evidence presented before the Board, Abbate's felony conviction for aggravated battery was related to or connected with his service as a policeman. Prior to and during the commission of the aggravated battery against Obrycka, Abbate battered two different people at that same bar. While he was at the bar, he announced that he was a Chicago police officer and repeatedly displayed his "muscles" to the other bar patrons. After these two physical assaults, no one called the police to report Abbate's misconduct. When he was beating Obrycka, he announced that "[n]obody tells me what to do." The evidence presented at the federal civil trial and the verdict of the federal jury further connects his commission of the aggravated battery and his service as a police officer. Specifically, the jury found that the "moving force"

behind Abbate's conduct was 'the persistent widespread custom or practice" of the Chicago Police Department's failure to adequately investigate and/or discipline officers, as well as the department's "code of silence."

¶ 64    Further, as the federal civil jury concluded, Abbate conspired with others to prevent him from being arrested for the beating of Obrycka. This conclusion is supported by the evidence presented to the Board, including portions of testimony from his state criminal trial and the testimony from the federal civil trial. Within hours of committing the offense of aggravate battery, Abbate sought out the assistance of various people, including Chicago police officers. He sought their assistance to obtain the videotape of the beating to thwart the police investigation. To obtain the videotape, he also threatened to use his position as a Chicago police officer by issuing DUI tickets and planting drugs on the employees and customers of the bar.

¶ 65    This court was clearly presented with evidence that Abbate's felony conviction for aggravated battery was related to or was connected with his service as a police officer where he used his position as a police officer in the commission of the aggravated battery of Obycka and in his subsequent attempts to cover up the investigation into his involvement. On these facts, the Board's denial of his benefits was proper, and the circuit court's judgment was erroneous.

¶ 66                                                    CONCLUSION

¶ 67    In light of the following, we uphold the Board's decision that pension forfeiture is triggered under section 5-227. Accordingly, we affirm the Board's determination that Abbate forfeited his pension benefits when he committed a felony relating to or arising out of or in connection with his service as a policeman.

¶ 68    Board affirmed; circuit court reversed.